Receipt Number
552051

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA and
THE STATE OF MICHIGAN,
ex *co-rels*. RICHARD CHESBROUGH, M.D. and
KIM CHESBROUGH,

      Plaintiffs,

v.

VPA,  P.C.
a Michigan Professional Corporation,
d/b/a Visiting Physicians Association

      Defendant.

_____/

Case: 2:06-cv-15630
Assigned To: Taylor, Anna Diggs
Referral Judge: Komives, Paul J
Filed: 12-18-2006 At 12:38 PM
cmp POSSIBLE SEALED MATTER (TAM)

Filed Under Seal Pursuant
to 42 USC 3730(b)(2)

Arnold M. Podolsky (P39124)
999 Haynes St. - Suite 395
Birmingham, MI 48009
248-433-3388
Plaintiffs Counsel

---

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

---

### INTRODUCTION AND NATURE OF ACTION

1.      This is an action filed by Co-Relators pursuant to the Qui Tam provisions of

the False Claims Act (31 USC 3729 et. seq.) to recover damages and penalties arising

from the submission of false claims to the United States, the Federal Medicare Program,

and to the State of Michigan Medicaid Programs.  The claims amount to tens of millions of

dollars for payment of unnecessary, undocumented, and otherwise improper radiological

charges.

2.          Defendant claims to be the nation's largest Physicians House Call Organization (http://www.visitingphysicians.com/ )  and provide a wide variety of medical care and services in six states (Michigan, Ohio, Georgia, Texas, Florida and Wisconsin, including the following radiological services :

- Electrocardiogram Testing
- X-Ray Studies
- Bone Mineral Density Tests
- Laboratory Testing
- Echocardiogram Testing
- Doppler Studies
- Pulmonary Function Tests
- Holter Monitor Testing
- Pulse Oximetry Tests

3.          Defendant performed imaging studies using their own equipment and technologists, but contracted with independent radiologists to actually read and interpret the studies.   Defendant contracted with Co-Relators through Radiology Medical Consultants, P.C. in 2005 and 2006 to provide radiological review of studies for Defendant's patients. [Exhibit B attached]

4.          During approximately 6 months of reviewing studies for Defendant, Co-Relators documented and brought to the attention of Defendant repeated and systematic problems with the imaging studies performed.  VPA refused to correct the problems, and Co-Relators therefore voluntarily ceased providing non-technical radiology  services for Defendant.

5.          The radiological studies billed by VPA were false and/or fraudulent under the False Claims Act, 31 USC 3729 for two reasons.

6.          First, Defendant was performing radiological tests that were either not properly documented as to indication, were performed with equipment that did not conform to industry standards or were administered by inadequately trained radiology technologists. Approximately one-half of the studies reviewed by Co-Relator Dr. Richard Chesbrough, were of either no diagnostic value or limited diagnostic value even though Defendants were submitting claims for such studies to Medicare and Medicaid for full payment. As such, submitting claims for payment of the studies is false and actionable under False Claims Act, 31 USC 3729(a)(1). Furthermore, Defendant's statements made as to the propriety of the studies along with the submitted claims for payment of the radiological studies, are actionable under False Claims Act, 31 USC 3729(a)(2).

7.          Second, and not unrelated to the above problems, Defendant is not owned by a physician as required under Michigan professional service statutes, including MCL 450.222 *et. seq.* The harm caused by violation of this statute as to lack of a physician owner was apparent in the lack of quality control. For example, despite complaints by Co-Relators, Defendant refused to correct the quality problems, and continued to submit claims to Medicare and other government and third party payors for defective radiological studies. As an improper, unauthorized and perhaps even illegal corporation providing medical services, Defendant has submitted claims in violation of the False Claims Act, 31 USC 3729(a)(2 and (7).

8.          The above described actions and claims are also actionable as false and/or fraudulent claims under Michigan's Medicaid False Claims Act, MCL 400.611(10)(a)(1).

9.          Approximately 50% of Defendant's patients are Medicare or Medicaid beneficiaries, and thus, the above outlined false claims represent a significant incidence of

improper requests by Defendants for reimbursement from CMS and false claims against the United States and State of Michigan governments.

10.        Given estimates of Defendant's billing in excess of $50 million dollars per year, the amount of this these fraudulent claims and resulting reimbursement is estimated to be at least $15 million dollars per year, possibly much more.

## PARTIES

11.        Co-Relators Richard Chesbrough, M.D. and Kim Chesbrough are citizens of the United States of America and residents of the State of Michigan, County of Oakland. Co-Relator Richard Chesbrough, M.D., is a physician in active practice who specializes in diagnostic radiology or imaging and is board-certified in that specialty.  Co-Relator Kim Chesbrough is a certified radiology technologist who was at all pertinent times director of operations for Radiology Medical Consultants, P.C., (hereafter referred to as RMCPC). The Co-Relators at all pertinent times were and are employed by RMCPC with whom VPA contracted for the interpretation and review services for VPA customer studies.

12.        Co-Relators are suing on their own behalf, and on behalf of, and in the name of, The United States of America, pursuant to 31 USC 3730(b) and the State of Michigan, pursuant to the *qui* tam provision of Michigan's Medicaid False Claim Act, MCL 400.611(10)(a)(1)

13.        Co-Relators have complied with notice provisions of both the Federal False Claims Act, 31 USC 3730(b)(2) and the Michigan Medicaid False Claims Act, MCL 400.611(10)(a)(2) by providing the Attorney General of the United States for the Eastern

District of Michigan, and the Michigan Attorney General, Health Care Fraud Division, simultaneously with the filing of this complaint, with a statement of material evidence and information related to this complaint, which support the existence of the false claims by Defendant. [Exhibit A attached]

14.        Defendant VPA, P.C., d/b/a Visiting Physicians Association (hereinafter referred to as VPA) is a Michigan Corporation formed pursuant to MCL 450.222 *et. seq.*, commonly known as the Michigan Professional Services Corporations Act.

15.        VPA, P.C. has its principal offices located in the City of Farmington Hills, County of Oakland, State of Michigan and has several assumed names, including Visiting Physicians Association, under which it does business.

16.        VPA, P.C. also conducts business in several states other than Michigan, including, but not necessarily limited to, Ohio, Georgia, Texas, Florida and Wisconsin.

17.        At all pertinent times VPA was controlled by Mark Mitchell, who is not and has never been a licensed medical professional.

18.        VPA provides in-home physician services which include medical doctors, assistants and technologists for examining and caring for homebound and disabled patients. Those qualifying homebound and disabled patients who are recipients of Medicare or Medicaid have their home health care needs, services and exams processed through Medicare or Medicaid, claims for which are submitted by VPA for reimbursement.

19.        VPA also provides diagnostic imaging services for these same patients and which include the technical component of obtaining images as well as the interpretation of the images obtained by the technical component, all of which is submitted to CMS and others by VPA for payment.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction in this matter under 31 USC 3732(a) and 28 USC 1331 and 1345.

21.     Further, this court may retain Co-Relators' State claims, the Michigan Medicaid False Claim Act claim, pursuant to its discretion to exercise pendant jurisdiction over that claim.  Pendant jurisdiction is proper in this case because Co-Relators' federal FCA claim is sufficiently substantial to support federal question jurisdiction; the FCA and Michigan FCA claims derive from a common nucleus of operative fact; and the nature of the FCA and Michigan FCA claims are such that judicial economy would be achieved and Co-Relators would expect that they be tried in one proceeding.

22.     Venue is proper in the United States District Court for the Eastern District of Michigan, Southern Division and said venue is proper pursuant to 31 USC 3732(a) and 28 USC 1391(b)(c) in that all claims were originated from Defendant's principal place of business in Farmington Hills, Michigan.

23.     Co-Relators have direct and independent knowledge within the meaning and definition of 31 U.S. C. 3730(e)(4)(B) derived through and from Co-Relators relationship with Defendant VPA at one or more of its facilities, of the information on which the allegations set forth in this Complaint are based. Furthermore, Co-Relators are persons qualifying as the original source of information pursuant to MCL 400.611(10)(a)(13).

24.     None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a

Congressional, administrative or general accounting office report, hearing, audit, investigation or from the news media.

## FACTS

## MEDICARE AND MEDICAID PROGRAMS

25.        The Social Security Act created the Medical Assistance Program. The United States administers the Federal Medicare Program through its agency, The Department of Health and Human Services (DHHS), The Center for Medicare and Medicaid Services (CMS), previously known as the Health Care Finance Administration. CMS is authorized to enter into and administer contracts on behalf of DHHS and the United States.

26.        Inherent in CMS's contracting authority is the responsibility for administering the Federal Medicare Program and Medicaid payments.

27.        The CMS is located in Baltimore, Maryland and all claims relating to Medicare reimbursement are sent to and processed through the Center for Medicare and Medicaid Services in Baltimore, Maryland.

28.        DHHS, through CMS, provides health insurance to eligible aged and disabled Americans (Medicare beneficiaries) pursuant to the provisions of the Medicare Program, Title XVIII of the Social Security Act, 42 USC 1395, et. seq.. The Medicare Program provides health care services and benefits to certain eligible groups such as persons over age sixty five, disabled persons and qualifying homebound persons in need of medical and nursing care. The Medicare Program is administered under two distinct parts.

29.        Medicare Part A, "Hospital Insurance for the Aged and Disabled", covers
health care services furnished by hospitals, home health agencies, hospices, and skilled
nursing facilities. Medicare Part B, "Supplementary Medical Insurance for the Aged and
Disabled", covers laboratory services, X-rays, physicians' services and other
non-institutional services, such as medical supplies and durable medical equipment (DME),
as well as some other services not reimbursed under Medicare Part A.

30.        The State of Michigan administers a Medicaid program consistent with the
Federal Rules and Regulations and is at risk for payment to approved healthcare providers,
including VPA.

31.        In Michigan, under MCL 400.105, the state Department of Community Health
has been authorized to establish a program of medical assistance for the medically
indigent pursuant to Title XIX. In establishing this program, the term "professionally
accepted standards" is defined as "those standards developed by peer review advisory
committees and professionals and experts with whom the director is required to consult."
Id. Under this section, "provider" means an "individual, sole proprietorship, partnership,
association, corporation, institution, agency, or other legal entity, who has entered into an
agreement of enrollment specified by the director pursuant to MCL 400.111b(1)(c)."

32.        Each provider is required to meet certain conditions to participate in the
Medicaid program. MCL 400.111b. That statute provides in part:

> (22) It is the obligation of a provider to assure that services, supplies, or
> equipment provided to, ordered, or prescribed on behalf of a medically
> indigent individual by that provider will meet professionally accepted
> standards for the medical necessity, appropriateness, and quality of health
> care."

33.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. See 42 USC426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 USC 1395c-1395i-4. Most entities, including VPA, derive a substantial portion of their revenue from the Medicare Program.

34.     HHS is responsible for the administration and supervision of the Medicare Program. CMS (formerly HCFA) is an agency of HHS and is directly responsible for the administration of the Medicare Program.35.     Under the Medicare Program, CMS (formerly HCFA) makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

35.     As detailed below, VPA submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

36.     VPA owners, officers and board of directors knew, or should have known that federal and state Medicare and Medicaid laws and regulations require all forms and requests for payments submitted to the respective governmental departments to be truthful, accurate, and complete. Furthermore, the owners, officers and board of directors

knew, or should have known that federal and state Medicare and Medicaid laws and regulations require that they promptly correct any errors or omission that come to their attention after being submitted to a government department.

37.     VPA owners, officers and board of directors knew, or should have known that federal and state Medicare and Medicaid laws and regulations require providers to assure that services, supplies, or equipment provided, ordered, or prescribed on behalf of a medically indigent individual by that provider will meet professionally accepted standards for the medical necessity, appropriateness, and quality of health care.

38.     VPA owners, officers and board of directors knew, or should have known that federal and state Medicare and Medicaid laws and regulations require a corporation providing medical services to be in compliance with State laws, including those requiring their corporation to be registered, and in fact operate, as a professional services corporation, including the reasons and healthcare policies behind those requirements.

## FALSE CLAIMS ACTS

39.     The Federal False Claim Act provides, in pertinent part, as follows:

**31 USC 3729. False Claims:**

(a) Liability for certain acts. Any person who

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person...

. . .

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, . . .

. . .

(b) Knowing and knowingly defined. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information--

    (1)    has actual knowledge of the information;

    (2)    acts in deliberate ignorance of the truth or falsity of the information; or

    (3)    acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

(c) Claim defined. For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

40.      The Michigan Medicaid False Claim Act provides, in pertinent part, as follows:

**Michigan Compiled Laws 400.603:**

(1)     A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.

(2)     A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.

(3)     A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

(4)     A person who violates this section is guilty of a felony, punishable by imprisonment of not more than 4 years, or a fine of not more than $50,000.00, or both.

41.     MCL 400.610a is the Michigan counterpart to the Federal False Claims act qui tam provisions and provides as follows:

(1)     Any person may bring a civil action in the name of this state under this section to recover losses that this state suffers from a violation of this act. A suit filed under this section shall not be dismissed unless the attorney general has been notified and had an opportunity to appear and oppose the dismissal. The attorney general waives the opportunity to oppose the dismissal if it is not exercised within 28 days of receiving notice.

(2)     If a person other than the attorney general initiates an action under this section, the complaint shall remain under seal and the clerk shall not issue the summons for service on the defendant until after the time for the attorney general's election under subsection (3) expires. At the time of filing the complaint, the person shall serve a copy of the complaint on the attorney general and shall disclose, in writing, substantially all material evidence and information in the person's possession supporting the complaint to the attorney general.

Page 12 of 26

. . .

(13)   Unless the person is the original source of the information, a person, other than the attorney general, shall not initiate an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a state or federal legislative, investigative, or administrative report, hearing, audit, or investigation, or from the news media. The person is the original source if he or she had direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the attorney general before filing an action based on that information under this section.

## VPA - RADIOLOGICAL SERVICES

**I.**      **DEFECTIVE IMAGING STUDIES**

42.      Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

**A.**   *X-RAY EXAMINATIONS*

43.      RMCPC provided physician services to VPA to interpret and report on imaging studies performed by VPA.

44.      Among the types of images submitted to RMCPC by VPA were plain radiographs (x-rays), ultrasound images of vasculature, ultrasound images of the heart and other organs, Computed Tomography (CT) scans and Magnetic Resonance Imaging (MRI) scans.

45.      The overall quality of X-ray studies was extremely poor, and not in compliance with objective guidelines and standards of care for Diagnostic Radiology as promulgated by the American College of Radiology.

46.        Many of the X-ray examinations were systematically over or under-exposed, markedly limiting the diagnostic information such that Co-Relator RMC, as a diagnostic radiologist, was unable to perform any diagnostic interpretation.

47.        In some cases, the arm was overlying the chest, or portions of the lung were obscured or not even included on the imaging field.

48.        In other cases, the positioning of the patient was substandard, severely limiting the diagnostic information required for full value from the study.

49.        These are deviation from objective standards of care for the technical performance of radiographic studies and many of these studies had to be read as "limited" or "non-diagnostic."

50.        In an RMCPC survey of cases, an estimated 50% of the X-ray examinations were so limited or non-diagnostic as to represent "defective testing" by objective standards.[Exhibit C attached], yet all were submitted for full reimbursement by VPA.

51.        Medicare and Medicaid do not reimburse such poor quality testing and such billing practice is prohibited by regulation, yet Defendant did submit such for payment and was paid by CMS for these poor quality and defective examinations.

52.        Billing for studies that are defective and not of diagnostic quality represent false claims since there is not the intended value for the service submitted for reimbursement.

53.        VPA has therefore knowingly submitted Federal False Claims for reimbursement  for poor quality diagnostic tests, since Medicare regulations,  42 CFR 410.33F, *inter alia*, only allow for reimbursement of indicated, appropriate diagnostic testing on Medicare beneficiaries.

B.    *ULTRASOUND EXAMINATIONS*

54.        Ultrasound examinations were also systematically suboptimal. In many cases, vascular imaging studies were performed with an improper transducer, rendering the studies of extremely limited diagnostic value.

55.        RMCPC experience with VPA ultrasound studies was that at least 60% of them did not have appropriate images to render a diagnostic interpretation, there being, as an example, many cases of vascular ultrasounds performed with a curved array transducer.

56.        There is no scientific basis to support use of this type of curved-array transducer for vascular imaging.

57.        This is inappropriate, or "defective testing," as these types of transducers are designed to be used with abdominal ultrasound and obstetrical ultrasound, not vascular ultrasound. Since the curved-array transducer is not intended for use in vascular ultrasound studies, any such studies using this type of transducer are defective and should therefore not be reimbursable by CMS.

58.        In addition to professional critique from RMC radiologists, RMC contracted with a registered vascular technologist (Ms. Lynn Labuda, RDMS, RVT) to perform an evaluation of a sample of ten (10) ultrasound vascular studies obtained from VPA.

59.        A summary of Ms. Labuda's findings is included in her review of cases [Exhibit D attached].  In her evaluation and analysis, Ms. Labuda noted that none of the ten sampled studies performed by VPA was within objective standards for diagnostic quality.

60.         Ms. Labuda outlined serious standard-of-care complaints with all of the vascular imaging studies performed by VPA.  Her findings demonstrate serious departures from and violations of objective criteria for performance of vascular ultrasound imaging studies, established by recognized national professional organizations such as the Society for Vascular Ultrasound (SVU).

61.         The outline for performance guidelines of these vascular ultrasounds, supplied by the SVU, represents objective published national standards for performance of vascular imaging.  [Exhibit E attached]

62.         VPA has therefore knowingly submitted Federal False Claims for reimbursement for poor quality diagnostic tests, since Medicare regulations, 42CFR410.33F, *inter alia*, only allow for reimbursement of indicated, and appropriate diagnostic testing on Medicare beneficiaries.

C.    *CARDIOVASCULAR EXAMINATIONS*

63.         Review of cardiac echocardiograms (ultrasounds) also revealed a systematic lack of quality of these mobile imaging studies.

64.         RMCPC contracted with an outside Board-Certified Cardiologist, Dr. Ibrahim Jawad for evaluation and professional interpretation of these specialized cardiac examinations performed by VPA.

65.         The quality of the VPA studies was so poor as to be grossly "inaccurate" in measurements, and to be of extremely limited diagnostic quality.

66.         RMCPC estimates that approximately 50% of the echocardiograms were non-diagnostic and/or of such poor quality as to represent defective testing.  [Exhibit F attached]

67.        VPA has therefore knowingly submitted Federal False Claims for reimbursement for poor quality diagnostic tests, since Medicare regulations,  42 CFR 410.33F, *inter alia*, only allow for reimbursement of indicated, appropriate diagnostic testing on Medicare beneficiaries.


## II.  LACK OF INDICATION FOR TESTING

68.        Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

69.        Many x-ray examinations did not have mandatory identification and labeling of the images, the patient name was often illegible and/or the date of the study, patient medical record, patient date of birth and other key identifying information was illegible or not included on the examination.

70.        An estimated 50% of x-ray examinations ordered did not have any clinical history attached and therefore cannot be said to be indicated studies.

71.        VPA vascular ultrasound imaging studies often had no clinical history or indication listed for the examination.

72.        Most of the cardiovascular echogram cases had "incomplete patient demographic data," with missing patient age, and no indication for the study.

73.        Many cardiovascular studies had no facility name and no technologist name – data that is critically important for quality assurance.

### III.   VIOLATIONS OF PHYSICIAN SUPERVISION REQUIREMENTS

74.       Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

75.       The term "practice of medicine" means "the actual diagnosing, curing or relieving in any degree or professing or attempting to diagnose, treat, cure or relieve any human disease, ailment, defect or complaint whether physical or mental origin by attendants or by advice or by prescribing or furnishing any drug, medicine, appliance, manipulation or method, or by any therapeutic agent whatsoever." MCL 333.16294.

76.       Michigan statute also provides that individuals are engaged in the practice of medicine if they hold themselves out to the public as a medical practitioner or medical office, or if an individual uses a machine to "diagnose particular problems" then that person is engaged in the practice of medicine in the state of Michigan and that any person who holds themselves out to the public as being engaged in the diagnosis of ailments is practicing medicine. Furthermore, any individual who "maintains an office for examination or treatment of persons afflicted" is also engaged in the practice of medicine.

77.       VPA, including it non-physician officer, owner and controller Mark Mitchell, hold themselves out to the public as being engaged in the diagnosis of treatment in human ailments (see www.visitingphysicians.com).

78.       As referenced above, VPA was controlled by a non-physician, Mark Mitchell, who, personally or through designated agents or employees, made all equipment and policy and procedure decisions for VPA.

79.     Among other things, all hiring and staffing decisions as well as equipment acquisition decisions (including equipment which uses ionizing radiation) are made by Mark Mitchell and other non-physician persons under his control.

80.     To the knowledge of Co-Relators, no physician designated by VPA as a supervising physician had any authority to control the quality of services delivered.

81.     To the knowledge of Co-Relators, VPA did not provide timely or proper documentation to CMS as to the identity of any supervising physicians and any changes therein.

82.     Further, VPA failed to comply with the requirements of 42 CFR 410.32(b)(3) as to physician supervision.

83.     In addition to state law, the federal government, through CMS, requires VPA to be legally incorporated in each of the states in which it operates.  42 CFR 410.33(a) requires diagnostic procedures, such as those billed by VPA, to be performed in compliance with State law:

> (a) *General rule.* (1) Effective for diagnostic procedures performed on or after March 15, 1999, carriers will pay for diagnostic procedures under the physician fee schedule only when performed by a physician, a group practice of physicians, an approved supplier of portable x-ray services, a nurse practitioner, or a clinical nurse specialist when he or she performs a test he or she is authorized by the State to perform...

84.     As a result of VPA violating the supervision requirements, it was not authorized to submit claims for payment to the CMS and United States government.

85.     Because VPA is an illegal corporation, illegally structured under the PSCA, reimbursement from Medicare and Medicaid has been obtained under knowing misrepresentations to Centers for Medicare and Medicaid Services (hereafter referred to as

Page 19 of 26

CMS) that it is a valid corporation.  VPA has no legal standing to bill the government, and has therefore received improper reimbursement by virtue of its illegal practice of medicine.

86.          The technical defects in VPA's corporate structure had a direct and negative effect on the level of patient care provided to patients.  The lack of physician ownership or control by VPA demonstrates the very reason for the requirement of medical quality oversight and adherence to medical ethics in the providing of patient care.

87.          All of the defects in radiological care observed by Co-Relators were related to cost savings and maximizing profit at the expense of providing proper quality services to patients.  VPA's corporate ownership relegated safe and effective patient care secondary to maximization of profits.

## IV.    CORPORATE MEDICAL PRACTICE / ILLEGAL CORPORATION

88.          Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

89.          VPA is registered as a professional corporation, or P.C.    VPA    does business under various assumed names, including Visiting Physicians Association.

90.          Michigan statute mandates that only licensed physicians may own and operate a business that provides medical services.  M.C.L.A. § 450.221, also known as the Professional Service Corporation Act (PSCA), forbids for-profit companies owned by non-licensed individuals from engaging in medical practice and performing medical services. Defendants Mitchell and VPA are not "licensed persons" as contemplated within the PSCA.

91.      As such, VPA is an illegal corporation and, because it has non-physician owners, officers and controllers, is prohibited from engaging in activities that encompass the practice of medicine in the State of Michigan.

92.      VPA is registered as a professional corporation, or P.C.  VPA does business under various assumed names, including Visiting Physicians Association.

93.      Although Michigan statute requires that all owners, officers and controllers be licensed in the same profession, VPA has been and is non-compliant. The owners, officers and controllers of the company (Mark Mitchell) include non-physicians who are not licensed in any of the learned professions.

94.      Michigan statute requires that all owners, officers and controllers be licensed in the same profession, yet VPA has been and is in violation of state statute.

95.      The owners, officers and controllers of the company (Mark Mitchell) include non-physicians who are not licensed in any of the learned professions and non-physicians are not lawfully permitted to own or control a medical professional corporation.

96.      Further, the Michigan Professional Services Corporation Act (MCL 450.224, hereafter referred to as PSCA) provides that, with some exceptions not relevant here, the only corporate form for the practice of medicine is a P.C. or PLLC and only these entities may engage in the corporate practice of medicine.

97.      In addition to managing mobile physician visits, VPA is involved in mobile diagnostic testing such as x-ray examinations, ultrasound examinations , bone mineral density, echocardiograms, pulmonary function tests, injections, Holter monitor testing, pulse oximetry testing, vaccinations, and laboratory testing.

98.     Providing physician and ancillary medical services such as ultrasound and x-ray clearly falls into the category of medical services and the practice of medicine.

99.     Among other things, all hiring and staffing decisions as well as equipment acquisition decisions (including equipment which uses ionizing radiation) are made by Mark Mitchell and other non-physician persons under his control.

100.    PSCA, forbids for-profit companies owned by non-licensed individuals from engaging in medical practice and performing medical services. Defendants Mitchell and VPA are not "licensed persons" as contemplated within the PSCA.

101.    As such, VPA is an illegal corporation and, because it has non-physician owners, officers and controllers, is prohibited from engaging in activities that encompass the practice of medicine in the State of Michigan.

102.    CMS, requires VPA to be legally incorporated in each of the states in which it operates, pursuant to 42CFR410.33 (a)

103.    Because VPA is an illegal and non-compliant corporation, illegally structured under the PSCA, reimbursement from Medicare and Medicaid has been obtained under knowing misrepresentations to Centers for Medicare and Medicaid Services (hereafter referred to as CMS) that it is a valid corporation.

104.    VPA has and had no legal standing to bill the government, and has therefore received improper reimbursement by virtue of its illegal corporate structure and unauthorized practice of medicine.


**DAMAGES - ESTIMATED SCOPE OF FALSE CLAIMS SUBMITTED**


Page 22 of 26

105.      RMCPC estimates of sampled VPA studies revealed approximately 50% of the X-ray and 60% of the ultrasound studies were not documented to be indicated, or were of non-diagnostic quality.

106.      Given that approximately 50% of VPA patient's are Medicare or Medicaid beneficiaries, this represents a significant incidence of improper requests for reimbursement from CMS and false claims against the United States government and taxpayers.

107.      Therefore it is estimated that at a minimum, 25%-30% of all inappropriate or defective studies performed by VPA are performed on patients for whom VPA would have submitted claims to CMS and other entities.

108.      Given estimates of VPA billing in excess of $50 million dollars per year, the amount of reimbursement for fraudulent claims may be estimated as high as $15 million dollars per year, possibly much more, if, because of its illegal corporate structure, all of the claims it has submitted to CMS were improper.

109.      Co-Relators do not have access to financial and accounting information or records for VPA at this time and therefore cannot be more specific at this time.

110.      VPA has been in existence since 1994.

## COUNT I
### Federal False Claims Act (31 USC  3729(a)(1))

111.      Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

Page 23 of 26

112.        VPA knowingly and intentionally submitted, or caused to be presented, claims for payment for radiological studies that were not properly indicated or documented as such, incomplete, defective and of no or limited diagnostic value.

113.        As such, VPA submitted false claims and violated the False Claims Acts of the United States and the State of Michigan, and is liable for all damages, penalties, fines set forth in those acts, as well as all other applicable relief.

**COUNT II**
**Federal False Claims Act) 31 USC  3729(a)(2))**

114.        Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

115.        VPA knowingly and intentionally used or made, or caused to be used or made, false records or statements, i.e. the false certifications and representations, when they submitted claims for payment for radiological studies that were not properly indicated or documented as such, incomplete, defective and of no or limited diagnostic value.

116.        As such, VPA submitted false claims and violated the False Claims Acts of the United States and the State of Michigan, and is liable for all damages, penalties, fines set forth in those acts, as well as all other applicable relief.

**COUNT III**
**Federal False Claims Act (31 USC 3729(a)(7))**

117.        Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

118.       VPA knowingly and intentionally used or made, or caused to be used or made, false records or statements, i.e. the false certifications and representations, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

119.       As such, VPA submitted false claims and violated the False Claims Acts of the United States and the State of Michigan, and is liable for all damages, penalties, fines set forth in those acts, as well as all other applicable relief.

**COUNT IV**
**Michigan Medicaid False Claims Act (MCL 400.611(10)(a))**

120.       Co-Relators incorporate by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

121.       The above actions, omissions, and allegations are all violations of the appropriate sections of the Michigan Medicaid False Claims Act.

122.       As such, VPA submitted false claims and violated the False Claims Acts of the United States and the State of Michigan, and is liable for all damages, penalties, fines set forth in those acts, as well as all other applicable relief.

**REQUEST FOR TRIAL BY JURY**

123.       Your Co-Relators, by and through their attorney, Arnold M. Podolsky, request that this matter be submitted for trial by jury as finder of fact.

**PRAYER FOR RELIEF**

Page 25 of 26

WHEREFORE, Co-Relators Richard Chesbrough, M.D. and Kim Chesbrough, by and through their attorney, and on behalf of the United States of America and the State of Michigan, respectfully request judgment be entered in their favor against Defendant, including:

1.      Treble the amount of the United States and the State of Michigan's damages;

2.      Any and all additional compensation, penalties, damages and relief allowable under the *Qui Tam* provisions of the Federal False Claims Act, being 31 USC 3729 *et. seq.* and the Michigan Medicaid False Claims Act, being MCL 400.611(10);

3.      Costs, interest and attorney fees;

4.      Other applicable legal and/or equitable relief that this court deems just and applicable.

5.      Applicable percentage of the total award as determined by this Honorable Court to be justified under the circumstances and taking into consideration, among other things,  whether the United States or State of Michigan governments intervene in this action.

Respectfully submitted, under seal

Arnold M. Podolsky, M.D.,J.D. P39124
Podolsky & Associates, P.C.
999 Haynes Suite 395
Birmingham, MI 48009-6775
(248)-433-3388

Dated: December 17, 2006

# EXHIBIT - A-

**Co-Relators Disclosure Statement of Material**
**Evidence and Information Relative to:**

**United State of America and State of Michigan**
***ex rel*** **Richard Chesbrough and Kim Chesbrough**
**vs.**
**VPA, P.C. d/b/a Visiting Physicians Association;**

I, Richard Chesbrough, M.D. (RMC), reside in the City of Bloomfield Hills, County of Oakland, State of Michigan. I am a medical doctor licensed in the State of Michigan and am in active practice as a diagnostic radiologist. I am board certified by the American College of Radiology. I am employed by Radiology Medical Consultants, P.C. and have personal knowledge of the facts stated herein.

I, Kim Chesbrough, reside in the City of Bloomfield Hills, County of Oakland, State of Michigan. I am a Registed Radiologic Technologist. I also hold a masters degree in health care administration. I am employed by Radiology Medical Consultants, P.C. and have personal knowledge of pertinent facts stated herein.

A    **Corporate Practice of Medicine / Illegal Corporate Structure**

    1.    VPA, P.C.(hereafter referred to as VPA) has been and is non-compliant with the Michigan Professional Services Corporation Act.  The owners, officers and controllers of the company (Mark Mitchell) include non-physicians who are not licensed in any of the learned professions.  Non-physicians are not lawfully permitted to own or control a medical professional corporation in Michigan.

    2.    In addition to managing mobile physician visits, VPA is involved in mobile diagnostic testing such as x-ray examinations, ultrasound examinations , bone mineral density, echocardiograms, pulmonary function tests, injections, Holter monitor testing, pulse oximetry testing, vaccinations, and laboratory testing.

    3.    VPA also provides physician and ancillary medical services such as ultrasound and x-ray which constitute the practice of medicine.

    4.    Among other things, all hiring and staffing decisions as well as equipment acquisition decisions (including equipment which uses ionizing radiation) are made by Mark Mitchell and other non-physician persons under his control.

5.     Radiology Medical Consultants, P.C. (RMCPC) began to perform radiology services (non-technical component) for VPA in December 2005, by oral contract. RMCPC and its President, Richard Chesbrough, M.D. (Co-relator herein), subsequently entered into a written, contractual relationship with VPA through its representative, Anna Smith, Operations Director for VPA, beginning 27 January 2006. [Exhibit B attached to Complaint]

6.     RMCPC agreed by contract to provide professional interpretations of x-ray and ultrasound studies for VPA on a fee-per-scan basis. During approximately 6 months of performing these services for VPA, the radiologists at RMCPC documented repeated and systematic problems with the imaging studies performed.

B.    **VPA OBTAINED REIMBURSEMENT FOR DEFECTIVE AND NON-INDICATED TESTING**

X-RAY SERVICES:

1.     The overall quality of X-ray studies was extremely poor, and not in compliance with objective and standards of care for Diagnostic Radiology as promulgated by the American College of Radiology.

2.     Many of the X-ray examinations were systematically over or under-exposed, markedly limiting the diagnostic information such that RMC, as a diagnostic radiologist, was unable to perform any diagnostic interpretation. In some cases, the arm was overlying the chest, or portions of the lung were obscured or not even included on the imaging field for a chest x-ray. Many of the x-ray examinations did not have mandatory identification and labeling of the images. The patient name was often illegible and/or the date of the study, patient medical record number, patient date of birth and other key identifying information was illegible or not included on the examination. In other cases, the positioning of the patient was substandard, severely limiting the diagnostic information required from the study. This is a deviation from objective standards of care for performance of radiographic studies. Many of these studies had to be read as "limited" or "non-diagnostic."

3.     In the RMCPC survey of VPA cases, an estimated 50% or more of the X-ray examinations were so limited or non-diagnostic as to represent "defective testing" by objective standards.[Exhibit C attached to complaint.] Further, an estimated 50% of x-ray examinations ordered did not have any clinical

Page 2 of 6

history attached and therefore cannot be said to be medically indicated or appropriate studies.

4.    Government programs such as Medicare and Medicaid should not reimburse for such poor quality testing and billing for such is prohibited by regulation. Billing for studies not performed or not indicated, or billing for studies that are defective and not of diagnostic quality represents a false claim since there is not the intended value for the service submitted for reimbursement.

ULTRASOUND SERVICES:

5.    Ultrasound examinations were also systematically suboptimal. In many cases, vascular imaging studies were performed with an improper transducer, rendering the studies non-diagnostic or of extremely limited diagnostic value. In the RMC experience with VPA ultrasound studies, at least 60% of them did not have appropriate images to render a diagnostic interpretation. For example, there were many cases of vascular ultrasounds performed with a curved array transducer.   This is inappropriate, or "defective testing," as these types of transducers are designed to be used with abdominal ultrasound and obstetrical ultrasound and not intended for use in vascular testing.  There is no scientific basis to support use of this type of curved-array transducer for vascular imaging.

6.    In addition to professional critique from RMC radiologists, RMC contracted with an independent registered vascular technologist (Ms. Lynn Labuda, RDMS, RVT) to perform an evaluation of ultrasound vascular studies obtained from VPA. A summary of Ms. Labuda's findings is included in her review of cases  [Exhibit D attached to complaint.].

7.    Ms Labuda's evaluation and analysis revealed that none of the  sampled studies performed by VPA was within objective standards of practice for diagnostic quality. She outlined serious standard-of-practice complaints with all of the vascular imaging studies performed by VPA.

8.    Ms. Labuda's findings are in sharp contrast to objective criteria for performance of vascular ultrasound imaging studies, established by national specialty societies such as the Society for Vascular Ultrasound (SVU). The outline for performance guidelines of these vascular ultrasounds, supplied by the SVU, represents published national standards for performance of vascular imaging.  [Exhibit E attached to complaint.]

9.    Furthermore, VPA vascular ultrasound imaging studies often had no clinical history or indication listed for the examination.  This raises the issue of inappropriate testing, as there was not an appropriate indication for the study.  Medicare regulations, 42 CFR 410.33F, only allow for reimbursement of indicated, appropriate diagnostic testing on Medicare beneficiaries.

CARDIOVASCULAR STUDIES:

10.   Review of cardiac echocardiograms also revealed a systematic lack of quality of these mobile imaging studies.  RMCPC contracted with an outside Board-Certified Cardiologist, Dr. Ibrahim Jawad for evaluation and professional interpretation of these specialized cardiac examinations.  In the opinion of this Cardiologist, the quality of the VPA studies was so poor as to be grossly "inaccurate" in measurements, and to be of extremely limited diagnostic quality.  Most of the cases had "incomplete patient demographic data," with missing patient age, and no indication stated for the study.

11.   Medicare and Medicaid only bill for appropriate studies with authorized indications.  According to Dr. Jawad, many of the studies had no facility name and no technician name – data that is critically important in the event of a quality assurance problem.  By RMC estimation, at least 50% of the echocardiograms were non-diagnostic and/or of such poor quality as to represent defective testing.  [Exhibit F attached to complaint.]

Quantification of Non-indicated and/or Defective Testing

12.   By RMC estimations from sampled VPA testing images, at least 50% of the X-ray and 60% of the ultrasound studies were not documented to be indicated, or were of non-diagnostic quality.  Given that an estimated 50% of VPA patient's are Medicare or Medicaid beneficiaries, this represents a significant incidence of improper requests for reimbursement from CMS and a fraud against the United States government.  These results indicate that at a minimum, 25%-30% of all inappropriate or defective studies performed by VPA are performed on government-funded patients.  Given estimates of VPA billing in excess of $50 million dollars per year, the amount of this fraudulent reimbursement may be estimated as high as $15 million dollars per year, or more.

C.   **HIPAA VIOLATIONS**

1.    On Thursday December 23, 2005, Radiology Medical Consultants received

sixty-eight (68) ultrasound examinations, delivered from VPA. The studies were delivered to the RMC post office box at 6632 Telegraph Road in Bloomfield Hills, Michigan. The ultrasound examinations included paper intake forms and worksheets, with ultrasound images on Polaroid film. The studies were placed in an open grocery bag and delivered to the front desk clerk at the mailbox office. The studies were plainly visible for anyone to reach into the open paper bag, pull out an ultrasound study, and look at the patient name, medical information and technologist's notes. Obviously, this is a flagrant violation of HIPAA regulations as to patient confidentiality.

2.   In an internal email, RMC immediately informed VPA that this practice was not standard of care, and not an acceptable method of delivery of ultrasound examinations. [Exhibit G attached to complaint.]

D.   **State Licensing Violations**

1.   In the few months that RMCPC interpreted studies for VPA, there were numerous instances of imaging studies presented for interpretation, which had been performed out of state. A brief survey of the studies interpreted indicated that approximately 25% of the examinations came from Ohio and Wisconsin, and were performed outside the state of Michigan, even though VPA knew that Dr. Chesbrough and radiologists for RMCPC, did not necessarily have an Ohio or Wisconsin state license.

2.   Many of the VPA studies were initially interpreted without realization of the physical location of the patient, and where the examination was performed. The RMCPC Operations Director, co-relator Kim Chesbrough, only realized this problem later, upon closer review of the VPA imaging documentation.

3.   This practice is a very serious violation of state law, where imaging examinations may only be interpreted by state-licensed physicians licensed in the state where the service is provided. [Exhibit H attached to complaint.]

E.   **Further Violations**

1.   Policies and procedures at VPA failed to comply with the requirements of 42 CFR 410.32(b)(3) as to physician supervision. To the knowledge of co-relators, no physician designated by VPA as a supervising physician had any authority to control the quality of services delivered.

2.      An illustration of this is the case of a Mr. Dennis Roark, who fraudulently obtained a medical license in the state of Michigan. While impersonating a physician, Mr. Roark was hired by Visiting Physicians Association and worked from 1995 through 1998 at VPA in Southfield, Michigan. Apparently, VPA never verified his professional credentials as required. Mr. Roark was only discovered after applying for a surgical position at Ingham Regional Medical Center in Lansing Michigan, in 1998.

3.      Investigation at the time confirmed that Mr. Roark had performed surgery on patients while employed as a physician for VPA. In three cases, women died several months after surgery performed by the fake doctor.    This episode serves as additional evidence of the organization's disregard for compliance and quality standards within the profession.

F.      **Summary**

1.      The quality of ultrasound studies, x-ray and echocardiographic studies performed and billed by VPA was so poor that the studies were often of minimal or no clinical value.    VPA's internal quality assurance and compliance procedures were effectively non-existent. RMC's experience with attempting to perform interpretations of VPA imaging studies confirms systematic flagrant deviations from objective and recognized radiology practice standards by VPA. [Exhibit I attached to complaint.]

Respectfully submitted,

_____          _____
Richard M. Chesbrough, M.D.                         Kim Chesbrough
Co-relator                                                         Co-relator
Diplomate, American Board of Radiology      Director of Operations, RMC, P.C.

Subscribed and sworn to under oath before me
this _14th day of December, 2006

_____
_____ Wayne County_____, Notary Public
Oakland County, Michigan-acting in ____Oakland____ County
My commission expires

SHARON D. McEWEN
Notary Public, Wayne County, MI
Acting In ____Oakland____ County
My Commission Expires 06/17/2007

Page 6 of  6

# EXHIBIT - B-

# INDEPENDENT CONTRACTOR AGREEMENT
## Radiology Services – Visiting Physicians Association

## ARTICLE 1:  PARTIES

This Agreement is entered into by and between: **Radiology Medical Consultants, P.C.** ("Corporation") and **Visiting Physicians Association** ("Client").  This Agreement will become effective on 2̲4̲ January 2006.

## ARTICLE 2:  REPRESENTATIONS:

2.01    Client seeks to have Corporation arrange professional interpretation of Imaging studies by qualified Radiology physicians.

2.02    Corporation enters into this Agreement, and will remain throughout the term of this Agreement, as an Independent Contractor to Client; not entitled to disability or unemployment insurance, worker's compensation, medical insurance, life insurance or sick leave.

2.03    Corporation is responsible for paying all income taxes, including estimated taxes, incurred as a result of the compensation paid by Client to Corporation for services under this Agreement.

## ARTICLE 3:  COMPENSATION

3.01    Based on volume, fee schedule for exam interpretation with report is as follows:
> $10  X-ray exams
> $20  Ultrasound (Abdomen/Kidney/Pelvis/Prostate/Breast)
> $25  Ultrasound Vascular
> $35  Ultrasound Echocardiogram
> *Each body part denotes one exam.*

3.02    Corporation shall provide an invoice to Client by the 10th of each month for services provided by the Company in the previous month.  Client shall pay such invoice within fourteen (14) days of receipt, to avoid additional late-payment fees. Late payment fees are 2% within first 14 days, 5% 15–30 days. If payment is not received by 30th days after due date, Corporation may cease to provide onsite coverage, and all services, for Client. Client agrees to reimburse Corporation for costs associated with collecting all payments and late fees.

## ARTICLE 4:  BUSINESS EXPENSES

4.01    Corporation will maintain its own medical liability policy, with limits not less than $200,000/$600,000 limits of liability.

4.02    Corporation is responsible for providing, at Corporation's own expense; proof of Residency Training, Fellowship Training, Board Certification and state licenses of any designated physicians involved in reading cases submitted by Client.

4.03     Client agrees to pay all costs associated with additional state licenses for Corporation's physicians to interpret exams in states in which they are not currently licensed.

4.04.1   Client agrees to pay all costs associated with any IT Connectivity and establishing Internet connections between Client site(s) and Corporation.  This includes, but is not limited to, time and materials of IT personnel, as well as needed equipment, to allow broadband connectivity.

## ARTICLE 5:  GENERAL PROVISIONS / TERMINATION

5.1     Term of Agreement is one (1) year, unless otherwise negotiated between both parties. Both parties understand that this business relationship is an "At Will" arrangement; which may be terminated by Corporation or Client, without cause, with 60 days written notice.

5.2     Modifications: Any modification of this Agreement will be effective only by written agreement, signed by both parties.

5.3     Client admits that Corporation has no involvement with billing procedures of Medicare, Medicaid, BCBS, or any third-party provider.

5.4     Client warrants that exams are of diagnostic quality in keeping with standards in the industry.

5.5     Client will only provide exams for interpretation in which physician has an active state license.

5.6     Client will be financially responsible for providing images (hard-copy or computerized) at designated site specified by Corporation.

5.7     Client is responsible for all billing and compliance procedures, and with all HIPAA, State and Federal laws.  Client agrees to hold Corporation harmless, and bear any costs arising from claims of wrongful billing and any other related activities.

5.8     This Agreement shall be governed by the laws of the state of Michigan.

## ARTICLE 6:  SIGNATURES

This Agreement is executed in the County of Oakland, State of Michigan, on this ___ day of January 2006.

_____                    1-27-06
Visiting Physicians Association  (Authorized Representative)          Date

_____                    1-6-06
Kim Chesbrough                                      Date
Radiology Medical Consultants, P.C. (Corporation)

2



**Anna W. Smith, RT, R**
*Director of Operations*
asmith@visitingphysicians.com

**Headquarters**
27000 Hills Tech Court, Suite 200
Farmington Hills, MI 48331  USA

800-759-7291  phone   ext. 304
248-358-4962  facsimile
248-361-5723  mobile

*www.visitingphysicians.com*

Diagnostics
1.800.759.7291

*Quality Services for Modern Health Care*

# EXHIBIT - C-

VPA Cases -- QA Issues

1. Stephens, Lula; acct/case no. 125180/403604; 4/4/06.  Chest and L-sp:  marked overpenetration on lateral, accentuated by digitization artifact.  L-sp:  AP view underrpenetrated.
2. Start, Clarence; acct/case no. 224088/101193; 4/4/06.  Chest:  AP with partially cut-off right costophrenic sulcus; lateral with arm obscuring thorax.  Probably best films possible with very old patient.
3. Beck, Norma; acct/case no. 94626/404277; 4/4/06.  Chest:  Lateral nondiagnostic b/c of overpenetration; bra left on for AP.
4. Hornstra, Judy; acct/case no. 51659/not listed; 4/4/06.  Chest:  Bra left on; safety pins overlying right axilla.



**Diagnostics**

# VPA Diagnostics

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:   (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | VPA Marysville | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Minier, Phyllis | **DOB:** | 2-23-35 |
| **Account#:** | 33945 | **Room No.:** | ---- |
| **Ordering Phy.:** | Farruch | **Tech:** | Steve Yancey |

**Examination:**    **Radiographs of the Chest**

**History:**    Cough.

**Findings:**

Frontal and lateral views were obtained.  The lateral view is ~~markedly suboptimal~~ because of partial non-inclusion of the posterior thorax.  Lungs otherwise are clear except for calcified bilateral lung granulomas.  Heart size is within normal range.  No pleural effusion, lung edema or other significant abnormality.

**IMPRESSION:**

Likely nothing acute.

**Reza Sazgari, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Reza Sazgari, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:   (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | Pine Rest | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Fetrow, Linda | **DOB:** | 1-31-51 |
| **Account#:** | 10006445 | **Room No.:** | 336 |
| **Ordering Phy.:** | Armstrong | **Tech:** | Rob Cool |

**Examination:**     **Radiographs of the Chest**

**History:**     Congestion.

**Findings:**

Frontal and lateral radiographs reveal light technique.  Heart size and mediastinal contours are normal.  Lungs are clear, with evidence of low lung volumes.  No definite pneumonia.

**IMPRESSION:**

Light technique.  No definite pneumonia.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

29829 Telegraph Road, Suite #107
Southfield, MI 48034

(800) 759-7291
Office: (248) 358-4411
Fax:   (248) 358-4163

| | | | |
|---|---|---|---|
| **Facility:** | Metron Bloomingdale | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Fry, Catherine | **DOB:** | 1-23-16 |
| **Account#:** | 87480 | **Room No.:** | 4 |
| **Ordering Phy.:** | Kovach | **Tech:** | Rob Cool |

**Examination:**   **Radiographs of the Chest**

**History:**   Congestion.

**Comparison:**   Chest dated 12-22-05.

**Findings:**

No focal consolidation, effusion or pneumothorax is seen.  Heart size and pulmonary vascularity are normal.  Osseous structures are intact.

There is light technique.  Changes of prior coronary bypass noted.

**IMPRESSION:**

No active disease.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:  (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | VPA Lansing | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Eding, Myrtle | **DOB:** | 11-11-06 |
| **Account#:** | 110241 | **Room No.:** | ---- |
| **Ordering Phy.:** | Tucker | **Tech:** | Norm Sorrell |

**Examination:**     **Radiographs of the AP Chest**

**History:**          Congestion.

**Findings:**

AP chest reveals light technique, with patient rotated to the left.  No definite pneumonia identified.
Degenerative changes present in the shoulders.

**IMPRESSION:**

Light technique.  No definite pneumonia.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:  (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | Metron Big Rapids | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Croll, Jean | **DOB:** | 8-31-23 |
| **Account#:** | 143420 | **Room No.:** | 18 |
| **Ordering Phy.:** | Mans | **Tech:** | Rob Cool |

**Examination:**      **Radiographs of the Chest**

**History:**            Congestion.

**Findings:**

AP chest is light in technique and poorly positioned.  Patient rotated to the left.  No definite pneumonia identified.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:   (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | VPA Marysville | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Kohn, Gladys | **DOB:** | 1-14-20 |
| **Account#:** | 76409 | **Room No.:** | ----- |
| **Ordering Phy.:** | Farruch | **Tech:** | Farruch |

**Examination:**       **Radiographs of the Lumbar Spine**

**Findings:**

Views of the lumbar spine are poorly positioned, with poor technique.  There is marked degenerative change in the lumbar spine, seen on the AP film.  There is no lateral view of this region.  Sutures are seen overlying the pelvis.

**IMPRESSION:**

Markedly limited study, with severe degenerative change in the lumbar spine.  Repeat images should be obtained for diagnosis.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

## Diagnostics

29829 Telegraph Road, Suite #107
Southfield, MI 48034

(800) 759-7291
Office: (248) 358-4411
Fax:  (248) 358-4163

| | | | |
|---|---|---|---|
| **Facility:** | Genesys | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Varnes, Tillie | **DOB:** | 3-5-12 |
| **Account#:** | 105303 | **Room No.:** | ---- |
| **Ordering Phy.:** | Braver | **Tech:** | Collen Gohn |

**Examination:**  **Radiograph of the Chest**

**History:**  Cough.

**Findings:**

Frontal and lateral views of the chest reveal extremely light technique.  Heart size is prominent. Lungs are free of focal infiltrate.  Prominent interstitial markings may be technique related.

**IMPRESSION:**

Extremely light technique, without definite pneumonia.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:  (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | VPA Lansing | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Eding, Myrtle | **DOB:** | 11-11-06 |
| **Account#:** | 110241 | **Room No.:** | ---- |
| **Ordering Phy.:** | Tucker | **Tech:** | Norm Sorrell |

**Examination:**       **Radiographs of the AP Chest**

**History:**             Congestion.

**Findings:**

AP chest reveals light technique, with patient rotated to the left.  No definite pneumonia identified. Degenerative changes present in the shoulders.

**IMPRESSION:**

Light technique.  No definite pneumonia.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:   (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | VPA Saginaw | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Veit, John | **DOB:** | 6-19-26 |
| **Account#:** | 131738 | **Room No.:** | ---- |
| **Ordering Phy.:** | Amaning | **Tech:** | Dee Dysinger |

**Examination:**     **Radiographs of the Chest**

**History:**          Pneumonia.

**Findings:**

Frontal view of the chest reveals very light technique, with is quite limited.  Lungs are clear, without pneumonia.  Left ventricular contour is identified to the heart.  This is unchanged from prior study of July 2005.

**IMPRESSION:**

Light technique, no evidence of pneumonia.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



**Diagnostics**

# VPA Diagnostics

29829 Telegraph Road, Suite #107
Southfield, MI 48034

(800) 759-7291
*Office: (248) 358-4411*
*Fax: (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | Genesys | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Varnes, Tillie | **DOB:** | 3-5-12 |
| **Account#:** | 105303 | **Room No.:** | ---- |
| **Ordering Phy.:** | Braver | **Tech:** | Collen Gohn |

**Examination:**     **Radiograph of the Chest**

**History:**          Cough.

**Findings:**

Frontal and lateral views of the chest reveal extremely light technique.  Heart size is prominent.
Lungs are free of focal infiltrate.  Prominent interstitial markings may be technique related.

**IMPRESSION:**

Extremely light technique, without definite pneumonia.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06



# VPA Diagnostics

**Diagnostics**

*29829 Telegraph Road, Suite #107*
*Southfield, MI 48034*

*(800) 759-7291*
*Office: (248) 358-4411*
*Fax:   (248) 358-4163*

| | | | |
|---|---|---|---|
| **Facility:** | Metron Big Rapids | **Exam Date:** | 3-29-06 |
| **Patient Name:** | Croll, Jean | **DOB:** | 8-31-23 |
| **Account#:** | 143420 | **Room No.:** | 18 |
| **Ordering Phy.:** | Mans | **Tech:** | Rob Cool |

**Examination:**    **Radiographs of the Chest**

**History:**    Congestion.

**Findings:**

AP chest is light in technique and poorly positioned.  Patient rotated to the left.  No definite pneumonia identified.

**Richard Chesbrough, M.D.**
Radiology Medical Consultants, P.C.
RS:mg

This has been electronically signed by Richard Chesbrough, M.D. on 03/31/06